UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

JUDY AKERS, individually,
and as Administrator of the
ESTATE OF WALTER AKERS, deceased,

       Plaintiffs,

v.                               Civil Action No. 2:12-cv-0667

MINNESOTA LIFE INSURANCE CO. and
ALPHA NATURAL RESOURCES, LLC,

       Defendants.


<u>MEMORANDUM OPINION AND ORDER</u>


       Pending are the motion by plaintiff Judy Akers ("Ms. Akers" or "Akers") for summary judgment, filed March 22, 2013, the motion by defendant Minnesota Life Insurance Company ("Minnesota Life") for summary judgment, filed March 27, 2013, and the motion by defendant Alpha Natural Resources, LLC ("Alpha") for summary judgment on coverage, also filed March 27, 2013.  At issue in this case is whether Minnesota Life was justified in denying benefits for Walter Akers under an employee benefit plan.

## I. Background

### A. Factual Background

Beginning in 2005, Walter Akers worked as an employee of Nicewonder Contracting ("Nicewonder").  That company was acquired by Alpha in 2007, and thereafter Nicewonder adopted Alpha's employee benefit plan.  Mr. Akers was entitled to, and did, enroll in Alpha's Welfare Benefit Plan (the "Plan" or the "Alpha Plan").  The Plan offered both Life and Accidental Death and Dismemberment ("AD&D") insurance.

With respect to life insurance benefits, the parties have stipulated that the Plan consists of three documents: (1) the Alpha Welfare Benefit Plan document ("the Master Plan"), (2) the Summary Plan Description for Alpha's Life and Accidental Death and Disability Plan ("the SPD"), and (3) Group Policy No. 18710-T (the "Policy") issued by Minnesota Life for Alpha as the Plan Sponsor.[1]  Stip. Concerning Documents that Make Up the Alpha Plan Exs. 1-3.

---

[1] Originally the Master Plan was not produced to the court or in discovery.  The court ordered on January 13, 2014 for the parties to stipulate to what documents constitute the Plan, in part because the SPD referred to other "plan documents"  and because the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001-1461 (2012) requires that the terms of the plan be described in a written document.  29 U.S.C. § 1102(a)(1), (b)(1-4) (2012).  In response to that order, the parties produced the Master Plan, in addition to the already-provided SPD and Policy.

Mr. Akers enrolled in basic & supplemental life insurance and basic AD&D insurance through the Policy.  Mr. Akers' basic life coverage and basic AD&D coverage began on October 1, 2007.  Alpha paid the premiums for those coverages. A month later, his Supplemental Life coverage began, which was paid for through payroll deductions.[2]  Ms. Akers claims that her husband was insured in the amount of $274,000 (three times his annual earnings) for each of these coverages, totaling $822,000 for all three.

In late May of 2010, Mr. Akers became severely injured after falling two stories from a ladder at home.  With the exception of a brief six-day period, he was continuously hospitalized until his death on January 25, 2011, at the age of 63.  3d Am. Compl. ¶ 22.  Despite his hospitalization, Alpha treated him as an employee during that time, paying him full salary, and remitting to Minnesota Life all payments for the coverages he elected under the Policy.  In addition, Minnesota Life accepted insurance payments for Mr. Akers' coverages and

---

[2] The Policy only offers one form of an AD&D benefit, and the parties do not dispute that Mr. Akers paid for and was an eligible group member for this benefit.  It is not known whether supplemental AD&D insurance was offered by another insurance carrier, but it does not matter because Ms. Akers does not request payment for supplemental AD&D benefits.  The SPD refers to both basic and supplemental forms of AD&D coverage.  Stip. Concerning Documents that Make Up the Alpha Plan, Ex. 2. at ALPHA 7-8, 20-26.

did not attempt to return them.  Alpha and Minnesota Life have
stipulated that Mr. Akers was an employee during this time and
should be treated as an "eligible group member" under the
Policy.  Stip. Alpha and Minn. Life with Respect to Walter
Akers' Emp't 1.

Shortly before Mr. Akers' death, Alpha decided to
terminate the Policy with Minnesota Life and go with a different
carrier for its group life insurance.  The termination date was
December 31, 2010, 25 days before Mr. Akers died.  Following his
death, Ms. Akers sought payment under a conversion privilege in
the Plan by filing a claim with Minnesota Life directly.  That
privilege, set out more fully below, differs in its terms
between the SPD and the Policy.  However, it generally provides
(1) that an insured may convert the group policy to an
individual policy of life insurance within 31 days of the date
of the group policy's termination, and (2) allows a beneficiary
to collect what the insured could have converted if the insured
dies within that 31-day period.  Mr. Akers never applied to
convert, but Ms. Akers sought payment because her husband died
during the 31-day period.  By letter dated May 10, 2011, and
sent to both Ms. Akers and Alpha, Minnesota Life denied the
claim.  Alpha's Mot. Summ. J., Ex. 4.  In the denial, Minnesota
Life simply stated that

> According to our records, the group life insurance coverage
> under [the Policy] and other policies issued to the [sic]
> Alpha Natural Resources, LLC were cancelled on December 31,
> 2010.  Because coverage on all individuals insured under
> this group policy would also terminate on December 31,
> 2010, Mr. Akers did not have any group life insurance in
> effect with our Company at the time of death.

Id.[3]  The denial letter did not reference the conversion

privilege.

        After learning of this denial, Alpha contacted

Minnesota Life through e-mail on May 26, 2011, requesting that

they reconsider based on the conversion language in the Policy.

Id. Ex. 5.  A response to that request, if any exists, has not

been placed in documents before the court.  During a meeting of

the Alpha Natural Resources Benefits Committee on June 21, 2011,

Alpha also agreed to pay some of the benefits to Ms. Akers that

it believed she was due from Minnesota Life.  Minn. Life's Mot.

Summ. J., Ex. 10.  Alpha paid Ms. Akers for coverage under the

Basic Life and AD&D coverages in the Policy, but not the

Supplemental Life coverage, totaling $548,000, with the

agreement that Alpha would attempt to recoup payment for those

two coverages from Minnesota Life, and that Ms. Akers would

return the money if Alpha was successful and Minnesota Life paid

---

[3] Minnesota Life also indicated that Mr. Akers was not eligible
for a waiver of premium benefit -- a separate benefit in the
policy stemming from accidents that cause disability -- because
Mr. Akers did not become totally and permanently disabled while
under the age of 60 and therefore did not qualify.  The waiver
of premium benefit is not related to the conversion privilege.

Ms. Akers directly.  Alpha's Mot. Summ. J. Ex. 6.

Minnesota Life responded to Ms. Akers' attorney through e-mail on December 14, 2011, continuing to deny the claim.  In that message, Mark Bremseth, a Manager of Group Insurance Claims at Minnesota Life, stated that "[t]he termination of the Group policy by the policy holder does not trigger an opportunity for conversion.  The insured must terminate eligibility (employment) with the employer while under coverage to trigger such an event." [4]  Minn. Life's Mot. Summ. J. Ex. 14.

B. The Plan Terms

The Master Plan provides that

> [t]he term 'Plan' includes the component benefit
> programs/plans which are presented as a Summary Plan
> Description ("SPD").  The Plan provides welfare benefits
> through each of the . . . component benefit programs . . .
> [including the] Life and Accidental Death and Dismemberment
> Insurance Program.

Stip. Concerning Documents that Make Up the Alpha Plan, Ex. 1, at 2 [hereinafter "Master Plan"].  The Master Plan provides no terms of any insurance, apparently deferring to other documents.

The title page of the SPD reads "Life and AD&D Insurance Plan," but the next page of the SPD states that

---

[4] Mr. Bremseth also stated again that Mr. Akers was not eligible for the waiver of premium benefit.

6

> This summary plan description (SPD) summarizes the
> provisions of the Alpha Natural Resources, LLC Life and
> AD&D Insurance Plan available to eligible employees who are
> actively employed by the Company on or after January 1,
> 2003.  Provisions of the Plan are governed by the terms of
> the applicable insurance contract and plan documents.  In
> case of any discrepancy between this SPD and the applicable
> insurance contract or plan documents, the insurance
> contract and plan documents will govern.

Id. Ex. 2, at ALPHA 1-3 [hereinafter "SPD"].  The SPD describes

various portions of the Plan, including who is eligible for

coverage under the basic and supplemental forms of life and AD&D

insurance, how to submit a claim, what events might affect

coverage, and the plan and claims administrators.  While the

Policy itself also overlaps some of the topics addressed by the

SPD, the Policy disagrees with the terms indicated by the SPD in

a number of respects.

     Under the section entitled "Converting Your Coverage",

the SPD states:

> When your Basic Life Insurance, Supplemental Life
> Insurance, and Supplemental AD&D Insurance coverage ends,
> you may convert your insurance to individual policies.
>
> . . . .
>
> For Basic Life Insurance and Supplemental Life Insurance
> (for yourself and your dependents) the following rules
> apply:
>
> - If you lose coverage because the group policy is
>   changed or cancelled, and your life insurance under
>   the Company's Plan has been in effect for at least
>   five years, the amount you may convert is limited to
>   the lesser of $10,000 or the amount of coverage you
>   lost as a result of the change.  This amount will be

7

reduced by the amount of other group insurance for
which you or your dependents become eligible within 31
days of the date your coverage under [Alpha's] Plan
ends.

- If you (or your dependents) lose coverage for any
  other reason, the amount you may convert may be up to
  the amount in force before your coverage under the
  Company's Plan ends.

To convert your Basic Life Insurance, Supplemental Life
Insurance, and Supplemental AD&D Insurance to individual
policies, you must apply to the insurance company and pay
the first premium within 31 days after you are no longer
covered.  If you die within the 31 days, and before your
individual policy goes into effect, the amount payable
under the group contract is limited to the maximum amount
you could have converted.

. . . .

You may not convert your Basic AD&D coverage.

SPD at ALPHA 35.

The Policy reads as follows:

[I]f the group policy terminates or is amended so as to
terminate the insurance, an owner under this policy may
convert the insurance under the group policy to an
individual policy of life insurance with [Minnesota Life]
subject to the following:

(1) The owner's written application to convert to an
    individual policy and the first premium for the
    individual policy must be received in our home
    office within 31 days of the date the insurance
    terminates under the group policy.

(2) The owner may convert all or a part of the group
    insurance in effect on the date that his or her
    coverage is terminated to an individual life
    insurance policy offered by us, except a policy of
    term insurance. . . .

(3) If the insured should die within 31 days of the

8

> date that insurance terminated under the group
> policy, the full amount of insurance that could
> have been converted under this policy will be
> paid.
>
> In the case of the termination of the group policy,
> [Minnesota Life] may require that an insured under a
> certificate be so insured for at least five years prior to
> the termination date in order to qualify for the above
> conversion privilege.

Policy at ALPHA 192 (emphasis added).

There is no dispute that Mr. Akers was not covered under the Policy for five years prior to termination or that he did not apply to convert his coverage.  Nor is there a dispute that Mr. Akers died within the 31-day period after termination of the policy.


C. Procedural History

Akers brought a complaint in the Circuit Court of Mingo County, West Virginia, on February 1, 2012 against Minnesota Life.  Minnesota Life timely removed to this court on March 8, 2012.[5]  The Third Amended Complaint claims that Minnesota Life violated W. Va. Code § 33-11-4, the Unfair Claims Settlement Statute, and Title 114, Series 14 of the Legislative Rules of the Insurance Commissioner of West Virginia.  3d Am.

---

[5] The complaint in Mingo County Circuit Court was served on the West Virginia Secretary of State as Minnesota Life's representative on February 8, 2012.

Compl. ¶¶ 33-34.  Akers also claims that Minnesota Life breached
a fiduciary duty of good faith and fair dealing, failed to pay
her under the policy terms, and fraudulently denied benefits.
Id. ¶¶ 35-37.  Akers asserts she was owed $822,000 ($274,000 for
each coverage) and consequential damages, attorney's fees,
costs, lost earnings, emotional distress, and punitive damages,
but states her right to the proceeds under the Basic Life and
Basic AD&D coverages have been assigned to Alpha.  Id. ¶¶ 38-40.
Akers claims that Alpha failed to notify Mr. Akers of the change
in group coverage and breached fiduciary and contractual duties
because it failed to continue Mr. Akers' Basic Life policy.  She
claims damages against Alpha in the amount of $274,000 she
believes she is owed under the Supplemental Life coverage and
consequential damages, attorney's fees, and costs.  Id. ¶¶ 43-
51.

        Against both Alpha and Minnesota Life, Akers brings
federal claims that the defendants violated the Employee
Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001-1461
because they have breached their duties as fiduciaries by
failing to provide the life insurance benefits.  Id. ¶¶ 52-62.
Minnesota Life has filed a counterclaim against Akers for a
declaratory judgment that it was not required to pay any
benefits and acted in good faith, and owes no damages to Akers

or Mr. Akers' estate.  Minn. Life Ans. 3d Am. Compl. and Counterclaim 9-12.  Alpha has filed a counterclaim against Akers requesting a declaration of the rights and obligations of the parties under the agreement whereby Alpha paid Akers what it believed she was entitled under the Basic Life and AD&D coverages.  Alpha Ans. to 2d Am. Compl., Counterclaim, and Cross-claim 12-13.  Alpha has also filed a cross-claim against Minnesota Life seeking indemnification for its payment to Akers and for any amount to which it might be jointly liable with Minnesota Life in the course of this litigation.  Id. at 13-15.

The court has original jurisdiction in diversity over the dispute pursuant to 28 U.S.C. § 1332.  It is undisputed that Judy Akers is a resident and citizen of West Virginia and that Walter Akers was also a citizen and resident of West Virginia when he was alive.  28 U.S.C. § 1332(c)(2) (decedent's legal representative assumes decedent's citizenship).  The parties also do not dispute that Alpha is a Virginia corporation with its principal place of business in Virginia, and that Minnesota Life is a Minnesota corporation with its principal place of business in Minnesota.  28 U.S.C. § 1332(c)(1) (2012).  The plaintiff requests compensation exceeding $75,000 -- at the least she requests $274,000, which is what she believes she is due under the Supplemental Life coverage.  3d Am. Compl. ¶ 49.

11

The parties are completely diverse and the amount in controversy requirement to exercise jurisdiction is satisfied.

There is also jurisdiction under 28 U.S.C. §§ 1331, 1367, as the plan is subject to ERISA and its interpretation is a matter of federal law, and all state law claims involve the same nucleus of operative facts as the federal claim. The plaintiff's claims arise not under the terms of a new policy issued by exercising the conversion privilege, but instead concern whether the plaintiff has a right to payment under the conversion provisions of the Alpha Plan, and therefore such claims are subject to ERISA. See McCale v. Union Labor Life Ins. Co., 881 F. Supp. 233, 235-36 (S.D.W. Va. 1995) (determining that state law claims under a right to conversion are preempted by ERISA, but under the conversion policy itself are not).

The court issued a bifurcation order on April 23, 2012, directing that the case proceed in two stages. The underlying coverage issue, that is, whether Walter Akers' beneficiary was due payment under the Plan, is to be decided first. All other claims are held in abeyance pending the decision on that issue. In accordance with the bifurcation order, this order pertains only to the coverage issue. To the extent that any party's motion for summary judgment seeks

adjudication of an issue other than coverage, those requests are denied without prejudice.

In their original briefing, Akers and Alpha both argue that Walter Akers was covered under the language of the Policy, because it is vague and should therefore be construed against the drafter, Minnesota Life.  Minnesota Life argues that the Policy language and SPD regarding conversion is not vague, and that Mr. Akers needed to first apply to convert before he could collect under the conversion provision.  No party mentioned ERISA.  The court ordered that the parties brief whether ERISA affects the coverage question on October 8, 2013.  Both parties argue that ERISA applies to the Alpha Plan, but dispute the meaning of the language.  Alpha and Akers believe that the Plan gives discretion to Alpha to determine coverage, and Minnesota Life believes that the Plan language gives it discretion. Minnesota Life also argues that it did not abuse that discretion in denying Ms. Akers' claim.

## II. Governing Standard

A party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Material facts are those necessary to

establish the elements of a party's cause of action.  Anderson
v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A genuine issue of material fact exists if, in viewing
the record and all reasonable inferences drawn therefrom in a
light most favorable to the non-moving party, a reasonable
factfinder could return a verdict for the non-movant.  Id.  The
moving party has the burden of "'showing' — that is, pointing
out to the district court — that there is an absence of evidence
to support the nonmoving party's case."  Celotex Corp. v.
Catrett, 477 U.S. 317, 325 (1986).  If the movant satisfies this
burden, the non-movant must respond by showing specific,
admissible evidence that establishes the existence of all
elements essential to the case.  Fed. R. Civ. P. 56(c-e);
Celotex, 477 U.S. at 322-23.  A party is entitled to summary
judgment if the "record as a whole could not lead a rational
trier of fact to find in favor of the non-movant."  Williams v.
Griffin, 952 F.2d 820, 823 (4th Cir. 1991).


## III. Analysis


The parties have framed the issue here as one of
coverage under the policy.  It involves a policy interpretation
issue.  There is no dispute that Mr. Akers was an eligible group

member and was covered under the policy as of the time it was
cancelled on December 31, 2010.  Nor is there a dispute that Mr.
Akers never applied for conversion.  Rather, at issue is whether
Minnesota Life was justified in denying Ms. Akers' claim based
on the language in the Plan regarding both conversion and
payment, upon termination of the group policy, when death ensued
within 31 days.  Compare Canada Life Assur. Co. v. Estate of
Lebowitz, 185 F.3d 231, 236-38 (4th Cir. 1999) (where coverage
of the decedent was in dispute and was dispositive as to whether
conversion was available, plan administrator's determination
that decedent was covered was given deference where plan
language gave the administrator discretionary authority to make
that determination, even when insurance company had
discretionary authority to adjudicate claims).

The issue gives rise to two separate but related
inquiries: (1) what standard of review (de novo or abuse of
discretion) the court applies to this claims determination and
(2) under that standard, was the claims determination proper?

The court notes initially that it is the claimant's
burden to demonstrate entitlement to benefits under the plan.
Ruttenberg v. U.S. Life Ins. Co., 413 F.3d 652, 663 (7th Cir.
2005); see Stanford v. Continental Cas. Co., 514 F.3d 354, 364
(4th Cir. 2008) (Wilkinson, J., dissenting) (quoting Gallagher

v. Reliance Standard Life Ins. Co., 305 F.3d 264, 270 (4th Cir. 2002), as providing that "claimants bear the burden of proving disability.").

The standard of review for a decision made by an administrator of an ERISA benefit plan generally is de novo. Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). However, where the plan gives the administrator discretionary authority to determine benefit eligibility or to construe plan terms, the standard of review is whether the administrator abused that discretion. Firestone, 489 U.S. at 111; Williams v. Metropolitan Life Ins. Co., 609 F.3d 622, 629-30 (4th Cir. 2010).

In determining whether discretionary authority exists, the court examines the plan documents de novo, "without deferring to either party's interpretation." Booth v. Wal-Mart Stores, Inc. Assocs. Health and Welfare Plan, 201 F.3d 335, 340 (4th Cir. 2000) (quoting Firestone, 489 U.S. at 112). "No specific phrases or terms are required in a plan to preclude a de novo standard of review." Gallagher v. Reliance Standard Life Ins. Co., 305 F.3d 264, 268 (4th Cir. 2002) (citing Feder v. Paul Revere Life Ins. Co., 228 F.3d 518, 522 (4th Cir. 2000)). Yet, "a grant of discretionary authority must be clear." Cosey v. Prudential Ins. Co. of Am., 735 F.3d 161, 165

(4th Cir. 2013). "Neither the parties nor the courts should have to divine whether discretion is conferred." Id. (quoting Sandy v. Reliance Standard Life Ins. Co., 222 F.3d 1202, 1207 (9th Cir. 2000)). Under the abuse of discretion standard, a plan administrator's decision will not be disturbed if it is reasonable, even if the reviewing court would have come to a different conclusion independently. See Smith v. Continental Cas. Co., 369 F.3d 412, 417 (4th Cir. 2004); Feder, 228 F.3d at 522. "[A] decision is reasonable if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." Ellis v. Metropolitan Life Ins. Co., 126 F.3d 228, 232 (4th Cir. 1997) (internal quotation marks omitted).

A recent alteration of the law in this area is noteworthy. In Metropolitan Life Ins. Co. v. Glenn, 554 U.S. 105 (2008), the Supreme Court discussed how a court conducts the review of a benefits determination when the plan administrator operated under a conflict of interest. Our court of appeals previously accounted for a conflict of interest by way of the modified abuse of discretion standard. See, e.g., Carden v. Aetna Life Ins. Co., 559 F.3d 256, 259-61 (4th Cir. 2009); Champion v. Black & Decker (U.S.) Inc., 550 F.3d 353, 358 (4th Cir. 2008). Following Glenn, however, "a conflict of interest

17

becomes just one of the 'several different, often case-specific, factors' to be weighed together in determining whether the administrator abused its discretion." <u>Carden</u>, 559 F.3d at 260 (quoting <u>Glenn</u>, 554 U.S. at 117). The weight accorded to the conflict "will . . . depend largely on the plan's language and on consideration of other relevant factors." Id. at 261.

A nonexclusive recitation of those "other relevent factors" is found in <u>Booth</u>, which directs a reviewing court to consider:

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

<u>Booth</u>, 201 F.3d at 342-43; <u>Johannssen v. District No. 1-Pacific Coast Dist., MEBA Pension Plan</u>, 292 F.3d 159, 176 (4th Cir. 2002); <u>see also</u> <u>Lockhart v. UMWA 1974 Pension Trust</u>, 5 F.3d 74, 77 (4th Cir. 1993).

There are compelling reasons for the deferential standard of review, not the least of which is that it "'ensure[s] that administrative responsibility rests with those

whose experience is daily and continual, not with judges whose
exposure is episodic and occasional.'" Brogan v. Holland, 105
F.3d 158, 161, 164 (4th Cir. 1997) (noting no abuse is present
if the decision "'is the result of a deliberate, principled
reasoning process and if it is supported by substantial
evidence.'") (citations omitted); Johannssen, 292 F.3d at 169;
Lockhart, 5 F.3d at 77 (noting the "dispositive principle
remains . . . that where plan fiduciaries have offered a
reasonable interpretation of disputed provisions, courts may not
replace it with an interpretation of their own."

        Nevertheless, there are circumstances where a
reviewing court will direct an administrator to have another
look at a claim through the device of remand.  The circumstances
justifying a remand, however, are quite exceptional:

>   If the court believes the administrator lacked adequate
>   evidence on which to base a decision, "the proper course[
>   is] to 'remand to the trustees for a new determination,'
>   not to bring additional evidence before the district
>   court."  As we have previously indicated, however, "remand
>   should be used sparingly."  Remand is most appropriate
>   "where the plan itself commits the trustees to consider
>   relevant information which they failed to consider or where
>   [the] decision involves 'records that were readily
>   available and records that trustees had agreed that they
>   would verify.'" The district court may also exercise its
>   discretion to remand a claim "where there are multiple
>   issues and little evidentiary record to review."

Elliott v. Sara Lee Corp., 190 F.3d 601, 609 (4th Cir. 1999)
(citations and quoted authority omitted); Berry v. Ciba-Geigy

Corp., 761 F.2d 1003, 1008 (4th Cir. 1985) ("The case for a
remand is strongest where plan itself commits the trustees to
consider relevant information which they failed to consider or
where decision involves 'records that were readily available and
records that trustees had agreed that they would verify.'").


A. Discretionary Authority


1. Relevant Plan Provisions


        Of the three documents that the parties stipulate
constitute the Plan, the court observes that the Master Plan and
the SPD contain language regarding discretion, while the Policy
does not.  The Master Plan states as follows:

    DETERMINATIONS AS TO ELIGIBILITY, COVERAGE, PAYMENTS AND
    REIMBURSMENTS

    . . . .

    For component benefit programs that are provided through
    the purchase of insurance, the insurance company makes the
    final determination as to claims. . . .

    Persons or entities which exercise discretion in the
    interpretation, application or administration of the Plan
    are authorized to exercise such discretion to the fullest
    extent permitted by law, including, without limitation, the
    discretion to determine facts necessary to the
    interpretation, application, or administration of the plan.


Master Plan at 4-5.  The SPD contains the following:

>The Plan Administrator is responsible for the operation of the benefit plan.  The Plan Administrator also has the discretionary authority to resolve any questions relating to the Plan and to interpret the Plan.
>
>The Plan Administrator may be contacted by writing or calling . . . Alpha Natural Resources, LLC.

SPD at 31.  With respect to life insurance claims, the SPD

reads:

>The Plan is fully insured through contracts with ING Life Insurance Company and Reliance Standard Life Insurance Company.  The insurance companies are responsible for investing the premiums and paying benefit claims.  They guarantee the payment of claims before the contract terminates.
>
>. . . .
>
>Claims for benefits under the Plan should be submitted to the insurance company listed below.
>
>BASIC LIFE, BASIC AD&D AND SUPPLEMENTAL LIFE BENEFITS
>The insurance company is:
>
>ING Employee Benefits . . . .
>
>. . . .
>
>SUPPLEMENTAL AD&D BENEFITS
>The insurance company is:
>
>Reliance Standard Life Insurance Company . . . .

SPD at 32.  The SPD also names the same aforementioned insurance

companies as the "Claims Administrator[s]" for those respective

claims.  SPD at 22.

As is apparent, the SPD does not name Minnesota Life

as the insurance company for life insurance claims.  The parties

state that ING Employee Benefits ("ING") was Minnesota Life's predecessor.  That is, Minnesota Life replaced ING as the insurer, not that ING was purchased by Minnesota Life or the rights of ING were somehow assigned to or assumed by Minnesota Life.  <u>See</u> Minn. Life's Reply Mem. Concerning Applicability ERISA 2 n.1 [hereinafter Minn. Life's ERISA Reply Mem.].  Nevertheless, Alpha and Minnesota Life have stipulated that the SPD as submitted is part of the Plan.


## 2. Minnesota Life's Authority

Minnesota Life argues that the Plan gives it the ultimate discretionary authority with respect to determining the validity of life insurance claims.  <u>See</u> Minnesota Life Mem. Concerning Applicability of ERISA 5 [hereinafter Minn. Life ERISA Mem.].  It asserts that the language of the plan does not provide explicit discretion for it to review claims, but rather creates "discretion by implication."  <u>Woods v. Prudential Ins. Co. of Am.</u>, 528 F.3d 320, 322 (4th Cir. 2008) (quoting <u>Feder</u>, 228 F.3d at 522-23).

By the terms of the Master Plan, Minnesota Life makes the "final determination as to claims."  This is so because the benefits Akers seeks are through the purchase of a Minnesota Life policy.  Master Plan at 4.  If the Master Plan stopped at

this point, it would not be enough to confer discretionary authority.  The "authority to make determinations does not carry with it the requisite discretion under Firestone unless the plan so provides." Woods, 528 F.3d at 322 (quoting Gallagher v. Reliance Standard Life Ins. Co., 305 F.3d 264, 269 (4th Cir. 2002)).

However, the Master Plan continues, and states that any entity having discretion to interpret the Plan will have discretion to the fullest extent permitted by law.  The court finds that this language, together with the fact the Minnesota Life will make a "final determination as to claims" imply that Minnesota Life was vested with discretionary authority to interpret the Plan inasmuch as it concerned benefits insured by Minnesota Life, even though the Master Plan does not explicitly grant discretionary authority.  In particular, this case is similar to others where implied discretionary authority was found.  In both Boyd v. Trustees of United Mine Workers Health and Retirement Funds, 873 F.2d 57, 59 (4th Cir. 1989) and Lockhart v. United Mine Workers of Am. 1974 Pension Trust, 5 F.3d 74, 77 (4th Cir. 1993), the administrator could promulgate rules to implement the plan and could make a "full and final determination as to all issues concerning eligibility for benefits."  Because the terms of the plan "indicate a clear

intention to delegate final authority" for Minnesota Life to
decide claims, Minnesota Life is vested with discretionary
authority.  <u>Feder v. Paul Revere Life Ins. Co.</u>, 228 F.3d 518,
524 (2004).

    The court notes that the parties also spend a
considerable portion of their ERISA briefing arguing whether and
to whom the language in the SPD grants discretion.  But the SPD
clearly states that in the event of a conflict between it and
any other plan documents, the other plan documents shall govern.
Because the Master Plan confers authority to Minnesota Life, the
SPD's directive conferring the same authority to Alpha
conflicts, and has no effect by the very terms of the SPD.[6,7]

---

[6] The court also doubts the parties' reliance on the SPD because,
although the parties have stipulated that the SPD is part of the
Plan, as a matter of law the SPD does not constitute terms of
the Plan.  In <u>CIGNA Corp. v. Amara</u>, 131 S.Ct. 1866, 1877-78
(2011), the Supreme Court indicated that "the information <u>about</u>
the plan provided by those disclosures [in the SPD] is not
itself <u>part of</u> the plan," and "we have no reason to believe that
the statute intends to . . . giv[e] the administrator the power
to set plan terms indirectly by including them in the summary
plan descriptions."  <u>Id.</u>  <u>See also</u> <u>Cosey</u>, 735 F.3d at 168 n.4
(citing <u>Amara</u>); <u>Woods</u>, 528 F.3d at 322 n.3.  <u>But see</u> <u>Canada Life</u>
<u>Assur. Co. v. Estate of Lebowitz</u>, 185 F.3d 231, 237 (1999)
(relying on language in the SPD regarding discretionary
authority).
[7] The Fourth Circuit has, in certain instances, enforced language
in the SPD when in opposition to terms of the Plan, even when a
disclaimer to the contrary is present in the SPD, as it is here.
<u>See, e.g.</u>, <u>Aiken v. Policy Management Sys. Corp.</u>, 13 F.3d 138,
140-41 (4th Cir. 1993); <u>Pierce v. Security Trust Life Ins. Co.</u>,
979 F.2d 23, 27 (4th Cir. 1992).  Even assuming this precedent
survives in light of <u>Amara</u>, <u>Cosey</u>, and <u>Woods</u>, <u>see</u> <u>supra</u> note 6,

The last document that is part of the Plan is the
Policy.  The Policy does not have any language granting
Minnesota Life discretionary authority.  While the Policy does
say that a claimant must provide "proof satisfactory to
[Minnesota Life]" to collect on a claim, such verbiage is not
enough to confer discretionary authority.  Policy at ALPHA 186,
197, 199, 200, 202; <u>Cosey</u>, 735 F.3d at 165-68.  The court finds
that the Policy has no bearing on the discretionary authority of
Minnesota Life.

For the above reasons, the court concludes that any
decision made by Minnesota Life with respect to Akers' benefits
is subject to review for an abuse of discretion.  In addition,
the court finds that Alpha did not retain discretionary
authority to review claims arising under Minnesota Life's
policy.[8]

---

it is not relevant here because the claimant, rather than the
administrator, must have significantly relied upon language in
the SPD or show prejudice flowing from a faulty plan description
to enforce the SPD.  <u>Aiken</u>, 13 F.3d at 141.  <u>See also</u> <u>Glocker v.
W.R. Grace & Co.</u>, 974 F.2d 540, 542-43 (4th Cir. 1992).

[8] Alpha also argues often throughout the briefing that its
dispute with Minnesota Life is one solely under the terms of the
insurance contract, and not subject to the vagaries of ERISA.
While that may (or may not) be true, the question to be decided
at this juncture is whether a decision under the Plan was
authorized, not whether a contract was breached.

## B. Abuse of Discretion

The totality of responses to Akers' claim by Minnesota Life that have been placed in the record consists of two documents.  The first is the denial letter of May 10, 2011. That letter did not address the conversion privilege, merely stating that "Mr. Akers did not have any group life insurance in effect with our Company at the time of death."  Alpha Mot. Summ. J., Ex. 4.  The second is an e-mail by Bremseth to Akers' counsel on May 26, 2011.[9]  That message referenced conversion, but stated that "[t]he termination of the Group policy by the policy holder does not trigger an opportunity for conversion. The insured must terminate eligibility (employment) with the employer while under coverage to trigger such an event."  Minn. Life's Mot. Summ. J. Ex. 14.

Minnesota Life also raises post-hoc arguments for why the decision was not an abuse of discretion.  These reasons for denial were never presented to the plaintiff during the claims process.  The court must consider the actual basis for Minnesota

---

[9]  As previously noted, both documents also addressed the waiver of premium benefit.  Supra notes 3, 4.  But the waiver of premium benefit is irrelevant, as it only lasts until the date the group insurance policy is terminated, Mr. Akers was under 60 and did not qualify, and Akers was seeking payment under the conversion privilege.  Policy at ALPHA 200.

Life's determination, and is "free to ignore ERISA plan
interpretations that did not actually furnish the basis for [the
claims] administrator's benefits decision". <u>Marolt v. Alliant
Techsystems, Inc.</u>, 146 F.3d 617, (8th Cir. 1998). <u>Cf.</u> <u>Thompson
v. Life Ins. Co. of North America</u>, 30 Fed. App'x 160, 164 (4th
Cir. 2002).

        In any event, as explained below, the post-hoc reasons
for denial put forth by Minnesota Life would have constituted an
abuse of discretion had they been the basis for Minnesota Life's
decision.  There are two arguments.  Minnesota Life argues that
its denial was not an abuse of discretion because the SPD
required that Akers be insured for five years prior to
termination to convert.  The other argument is that Minnesota
Life's decision was justified based on the Policy language.
Specifically, Minnesota Life argues that it was within Minnesota
Life's discretion of resolving ambiguities in the Policy to
determine that Mr. Akers could not convert based on the language
that Minnesota Life "may require" that Mr. Akers was insured for
five years to convert.

        Of the <u>Booth</u> factors the court considers in
determining whether the decision was an abuse of discretion, the
most relevant factors to this case are (1) "the language of the
plan," (2) "whether the decisionmaking process was reasoned and

27

principled," (3) "the fiduciary's motives and any conflict of interest it may have," and (4) "whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan." <u>Booth</u>, 201 F.3d at 342-43.

Minnesota Life's responses to Akers' claim are in stark contradiction to the language of the Policy (and the SPD). Its first response did not even reference the conversion privilege. Its second response stated that Alpha's termination of the group policy does not trigger an opportunity for conversion. Neither the Policy nor the SPD has any such requirement. Indeed, the Policy explicitly states that conversion is available "if the group policy terminates." Policy at ALPHA 192. It is clear that Minnesota Life ignored the language of the Plan in crafting its responses to claims. <u>See Blackshear v. Reliance Std. Life Ins. Co.</u>, 509 F.3d 634, 639 (4th Cir. 2007), abrogated on other grounds by <u>Metropolitan Life Ins. Co. v. Glenn</u>, 554 U.S. 105 (2008) (failure to correctly interpret plain terms of plan is an abuse of discretion).

Minnesota Life's post-hoc reliance on other terms of the Plan is similarly unavailing. Its first argument, that the SPD requires five years of coverage to convert, ignores the fact that the SPD also states that the Policy will govern in the

28

event of a conflict between the two documents.

Minnesota Life's second post-hoc argument fails because it is not in line with its prior interpretations of similar policies.  In discovery, Minnesota Life disclosed thirteen instances where it paid "insurance . . . that could have been converted where the insured died within 31 days of the group insurance policy termination date."  Alpha Mot. Summ. J., Ex. 9, Ans. 10.  Minnesota Life produced nine policies, covering eleven of these thirteen instances, each of which has identical language regarding conversion.[10]  They state:

> Limited conversion is available if, after you have been insured for at least five years, insurance is terminated because . . . the group policy is terminated . . . .
>
> You may convert up to the full amount of terminated insurance, but not more than the maximum. The maximum is the lesser of: (a) $10,000; and (b) the amount of life insurance which terminated minus any amount of group life insurance for which you become eligible under any group policy issued or reinstated by us or any other carrier within 31 days of the date the insurance terminated under the group policy.
>
> . . . .
>
> If you die during the 31-day period allowed for conversion, we will pay a death benefit regardless of whether or not an application for coverage under an individual policy has been submitted. The death benefit will be the amount of insurance you would have been eligible to convert under the terms of the conversion right section.

Alpha Mot. Summ. J., Ex. 10.  Of these eleven, four claims were

---

[10] Nine policies were produced.  Two policies had two claims each.

from insureds who did not have insurance in effect for five years before the group policy terminated, but were paid by Minnesota Life. Alpha Mot. Summ. J., Ex. 9. The two claimants whose policies were not produced also did not have insurance in effect for five years prior. Alpha Mot. Summ. J., Ex. 9. Minnesota Life has not stated whether the other seven claims arose from insureds who were not insured for five years before the group policy terminated.

Minnesota Life has produced no instances where it has declined to pay benefits that could have been converted. Thus, even when the policy required five years of prior coverage to convert but the insured was not so covered, Minnesota Life has paid what could have been converted anyway.[11] This policy is less restrictive -- it permits Minnesota Life to convert even though Akers was not insured for five years prior. Accordingly, refusing to pay is inconsistent with Minnesota Life's prior practices and interpretations. See, e.g., Juniper v. M & G

---

[11] Minnesota Life argues that some of the thirteen payments were payments under the waiver of premium benefit in these policies. That provision allows insurance to continue, often beyond the date of the group policy termination, for an insured who becomes disabled. But Minnesota Life provides no evidence to support this claim and does not identify which payments were for a waiver of premium benefit. More important, its discovery response identifies the thirteen payments as ones where it paid insurance . . . "that could have been converted where the insured died within 31 days of the group insurance policy termination date," not as waiver of premium benefit payments.

Polymers USA, LLC, 495 F. Supp. 2d 590, 601 (S.D. W.Va. 2007);
Patel v. United of Omaha Life Ins. Co., Civ. Action No. PWG-12-
880, 2013 WL 212863, at *7 (D. Md. Jan. 18, 2013).

        As to whether Minnesota Life's decision was reasoned
or principled, the court concludes that it was not.  The first
response did not address the conversion privilege, and the
second plainly ignored the language of the Policy.

        Finally, there was a conflict of interest involved.
Minnesota Life was both the claims administrator and the party
that would pay a claim, leaving Minnesota Life with an incentive
to deny claims.  Glenn, 554 U.S. at 116.  The court finds that
this conflict, involving several hundreds of thousands of
dollars, was "significant given 'the circumstances of this
case.'"  See Fortier v. Principal Life Ins. Co., 666 F.3d 231,
236 n.1 (4th Cir. 2012) (quoting Glenn, 554 U.S. at 108);
Florence Nightingale Nursing Serv., Inc. v. Blue Cross/Blue
Shield of Alabama, 41 F.3d 1476, (11th Cir. 1995) (pecuniary
interest supports a finding of conflict of interest).  This
pecuniary interest is magnified because Alpha terminated its
business relationship with Minnesota Life before the claim was
submitted, so it would no longer receive income from Alpha or
its employees.

The court concludes that Minnesota Life's decisions in this matter constituted an abuse of discretion.

## IV.

For the reasons stated above, it is, accordingly, ORDERED that:

(1) Minnesota Life's Motion for Summary Judgment, filed March 27, 2013, be, and it hereby is, DENIED as set forth herein;

(2) Alpha's Motion for Summary Judgment on Coverage, filed March 27, 2013, be, and it hereby is, GRANTED as set forth herein;

(3) Akers' Motion for Summary Judgment, filed March 22, 2013, be, and it hereby is, GRANTED as set forth herein;

(4) Minnesota Life abused its discretion in denying Ms. Akers' claim;

(5) by April 18, 2014, the parties shall submit to the court a joint status report recommending a schedule for resolution of the remaining issues in this case.

32

The Clerk is directed to transmit copies of this order to counsel of record and any unrepresented parties.

ENTER: March 31, 2014

John T. Copenhaver, Jr.
United States District Judge