UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

JUDY AKERS, individually,
and as Administrator of the
ESTATE OF WALTER AKERS, deceased,

      Plaintiffs,

v.                            Civil Action No. 2:12-cv-0667

MINNESOTA LIFE INSURANCE CO. and
ALPHA NATURAL RESOURCES, LLC,

      Defendants.


<u>MEMORANDUM OPINION AND ORDER</u>

      Pending are a motion to enforce settlement, filed by defendant Minnesota Life Insurance Company ("Minnesota Life") on May 5, 2014, and a motion to enforce settlement or in the alternative to determine no meeting of the minds existed by plaintiff Akers, filed on May 13, 2014.  An evidentiary hearing of the motions was held on July 1, 2014.  Findings of fact and conclusions of law are set forth below.


I. Background

      This action was timely removed to this court on March 8, 2012, after it was filed in the Circuit Court of Mingo County, West Virginia, on February 1, 2012.  Walter Akers, now

deceased, worked for defendant Alpha Natural Resources, LLC ("Alpha") before his death on January 25, 2011 at the age of 63. He died after being hospitalized almost continuously following an accident at home that occurred in late May of 2010.

At issue in this case is whether Judy Akers ("Akers" or "Ms. Akers"), Walter's wife, is entitled to collect certain insurance benefits outlined in Alpha's Welfare Benefit Plan (the "Plan" or the "Alpha Plan"). The Plan offered both Life and Accidental Death & Dismemberment ("AD&D") insurance. Mr. Akers was enrolled in both basic (that is, employer-paid) and supplemental (employee-paid) forms of life insurance, and he was also enrolled for Basic AD&D insurance. These insurance coverages under the Plan were issued in Group Policy 18710-T (the "Policy") by Minnesota Life for Alpha as the Plan Sponsor. According to Akers, she was and is entitled to collect $274,000 for each of these coverages as a result of her husband's death, but this has not been paid to her by Minnesota Life.

The dispute arises because Mr. Akers died after the the Policy terminated on December 31, 2010. Alpha chose to cancel the Minnesota Life Policy and go with a different insurance carrier. However, the Minnesota Life Policy contains a conversion privilege:

2

> [I]f the group policy terminates or is amended so as to terminate the insurance, an owner under this policy may convert the insurance under the group policy to an individual policy of life insurance with [Minnesota Life] subject to the following:
>
>> (1) The owner's written application to convert to an individual policy and the first premium for the individual policy must be received in our home office within 31 days of the date the insurance terminates under the group policy.
>>
>> (2) The owner may convert all or a part of the group insurance in effect on the date that his or her coverage is terminated to an individual life insurance policy offered by us, except a policy of term insurance. . . .
>>
>> (3) If the insured should die within 31 days of the date that insurance terminated under the group policy, the full amount of insurance that could have been converted under this policy will be paid.
>
> In the case of the termination of the group policy, [Minnesota Life] may require that an insured under a certificate be so insured for at least five years prior to the termination date in order to qualify for the above conversion privilege.

Stip. Concerning Documents that Make Up the Alpha Plan, Ex. 3, at ALPHA 192 [hereinafter "Policy"].  In addition, the Summary Plan Description ("SPD") for the Alpha Plan contains conversion provisions that differ in some respects from the language in the Policy.  See Stip. Concerning Documents that Make Up the Alpha Plan, Ex. 2, at ALPHA 35 [hereinafter "SPD"].  Mr. Akers was not employed by Alpha for five years prior to his death, but did die

within 31 days of the cancellation of the policy.[1]  Ms. Akers and
Alpha assert that Ms. Akers was entitled to collect the benefits
under the conversion privilege.

Before the suit began, by letter dated August 10,
2011, Alpha agreed to pay Ms. Akers $548,000 for the Basic Life
insurance benefit and the Basic AD&D benefit.  Evidentiary
Hearing, Pl. Ex. A.  Alpha did so "upon condition that it shall
have the right to recover all sums paid to you [(Akers)] from
the insurance carrier [(Minnesota Life)] under the Plan."  Id.
Their agreement also noted that

> The Plan Sponsor [(Alpha)] is pursuing payment of these
> benefits from the group insurance carrier under the Plan.
>
> . . .
>
> If the Plan Sponsor is successful in our efforts to obtain
> payment of the benefits from the group insurance carrier,
> you [(Akers)] agree to reimburse the Plan Sponsor or if
> payment is issued by the carrier directly to you, you agree
> not to cash or deposit any such check into your account and
> to sign over or otherwise immediately transfer the payment
> to Alpha.

Id.

Akers' original complaint in state court only named
Minnesota Life as a defendant.  Akers amended the complaint in
this court to name Alpha as a defendant as well, seeking the

---

[1] The parties stipulated that Mr. Akers should be treated as an
eligible employee, even though he was hospitalized and not
working for the last six months of his life.  Stip. Concerning
Walter Akers' Employment

4

Supplemental Life benefits from it.  Alpha has filed a cross-claim against Minnesota Life to recover the $548,000 it paid Akers.

Akers has amended her complaint a total of three times.  The first three complaints, that is, the original complaint, and the first and second amended complaints, alleged that Akers sought recovery from Minnesota Life for failure to pay according to the Supplemental Life coverage only.  <u>See</u> Not. Rem. Ex. A ¶ 31, First Amended Compl. ¶ 37, Second Amended Compl. ¶ 38.[2]  In the Third Amended Complaint, which was entered on April 16, 2013, Akers acknowledged payment from Alpha for the Basic Life and AD&D coverages, as she did in prior complaints:

> [T]he Decedent Plaintiff's employer, Defendant Alpha Natural Resources, paid to the Plaintiff benefits equal to five hundred forty-eight thousand dollars ($548,000.00) equal to the value of the Basic Life Coverage and AD&D Coverage in exchange for an assignment of Plaintiff's rights against Defendant Minnesota Life Insurance Company regarding those policies.  However, to date, neither Defendant Alpha Natural Resources nor Defendant Minnesota Life Insurance Company have paid to Plaintiff benefits under the Employee Paid Basic Life [(Supplemental Life)] coverage.

Third Am. Compl. ¶ 32.  Akers also asserted that

> due to Defendant Minnesota Life Insurance Company's unwarranted refusal to pay policy benefits to the Plaintiff as set forth herein, Plaintiff has suffered damages in an

---

[2] These complaints refer to the Supplemental Life benefits at some points as "Employee Paid Basic Life," as the premiums for these benefits were paid as deductions of the employee's paycheck rather than paid directly by Alpha.

> amount equal to the Basic Life Coverage, AD&D Coverage and
> Employee Paid Basic Life [(that is, the Supplemental Life)]
> coverage which is believed to be eight hundred and twenty
> two dollars [sic] ($822,000).  As stated above, Plaintiff
> has assigned her rights to proceeds from the Sponsor Paid
> Basic Life and Sponsor Paid Accidental Death &
> Dismemberment to Defendant Alpha Natural Resources Services
> [sic].

Third Amended Complaint, ¶ 38.[3]  In the motion seeking leave to

file a Third Amended Complaint, Akers indicated that she "is

moving to amend her Complaint to also add in causes of action

for the Basic Life Coverage and AD&D Coverage under the Plan."

Mot. Leave to File Third Am. Compl., ¶ 12.  The Third Amended

Complaint brings various state law claims against both

defendants -- that is, Alpha and Minnesota Life -- in connection

with their alleged failure to pay benefits, and also alleges a

breach of fiduciary duties by both defendants under the Employee

Retirement Income Security Act ("ERISA") 29 U.S.C. §§ 1001-1461.

        Pursuant to a bifurcation order, each of the parties

moved for summary judgment on the question of coverage alone,

with other claims held in abeyance.  On March 31, 2014, the

court entered a memorandum opinion and order on those motions,

---

[3] During the evidentiary hearing for the motions to enforce
settlement, counsel for Minnesota Life requested that the court
take judicial notice of: (1) the Third Amended Complaint, (2)
Minnesota Life's Answer to the Third Amended Complaint and
Counterclaim, and (3) Akers' Motion for Leave to File a Third
Amended Complaint.  The court took judicial notice of these
documents during the hearing.  The parties also stipulated that
the exhibits attached to their respective motions to enforce
settlement be placed into evidence, and the court so directed.

finding that Minnesota Life abused its discretion under ERISA in its denial of Ms. Akers' claims for benefits.

In that order, the court directed the parties to file a status report with the court.  The status report, filed April 25, 2014, indicated that

> Plaintiff Judy Akers and Defendant Minnesota Life Insurance Company ("Minnesota Life") entered into a confidential settlement on April 11, 2014.  The settlement will soon be consummated, and, accordingly, an appropriate Partial Dismissal Order will be tendered for entry.  The Partial Dismissal Order will reflect dismissal of the plaintiff's claims against the defendants with prejudice.  Meanwhile, Alpha Natural Resources, LLC ("Alpha") demands to be made privy to the details of the Akers-Minnesota Life settlement agreement and will not dismiss its pending claims against Akers.

Def. Ex. H, ¶ 1.  The settlement was not consummated.  Rather, on May 5, 2014, Minnesota Life filed its motion to enforce settlement.  In response, Akers filed her motion to enforce settlement or in the alternative to determine no meeting of the minds existed.

The dispute is this: Minnesota Life believes the agreement was to settle and dismiss all of Akers' claims in the Third Amended Complaint, while Akers believes the agreement was to settle and dismiss only the Supplemental Life claim in the Third Amended Complaint, or, that no agreement was ever reached.

The court is tasked with determining whether a settlement occurred and if so, the terms of such an agreement. Hensley v. Alcon Labs., Inc., 277 F.3d 535, 540-41 (4th Cir. 2002).  When the parties disagree over terms of a settlement, the law requires that the court hold an evidentiary hearing to find facts relating to the settlement.  See Williams v. Prof. Trans., Inc., 388 F.3d 127, 131-32 (4th Cir. 2004).  The court held such a hearing on July 1, 2014.

## II. Findings of Fact

The following findings of fact are made by a preponderance of the evidence.

In late 2012, several months before the filing of the Third Amended Complaint, Akers and Minnesota Life engaged in settlement discussions.  In an e-mail exchange on December 20, 2012 between Brett Preston, counsel for Akers, and Ed Tiffey,[4] counsel for Minnesota Life, the attorneys agreed to discuss "resolution of plaintiff's claim to benefits under the third policy so long as any agreement reached would not have an adverse impact on Alpha's claims as assignee under the first two policies."  Pl. Ex. C (emphasis supplied).  The "third policy"

---

[4] Because of the frequent references in this opinion to the plaintiff and counsel, the court has chosen generally to refer to each of them by last name only.

referred to was the Supplemental Life policy. At that time, Akers' operative complaint only concerned recovery of payment allegedly due under the Supplemental Life Policy. Those discussions, and a succeeding mediation, were not fruitful and the parties did not settle.

After entry of the court's order of March 31, 2014, Akers and Minnesota Life again began to discuss settlement. As early as April 3, 2014, Tiffey was aware that Preston "did not want to hurt Alpha" and did not want Alpha's rights affected by settling. Tr. __. As above noted, Tiffey was also long aware that Akers believed she had assigned to Alpha her interest in the Basic Life and Basic AD&D claims, as further specified in her Third Amended Complaint filed April 16, 2013. Tr. __.

Through an e-mail on April 10, 2014, Preston rejected Minnesota Life's offer to settle of $255,000. Def. Ex. B. During this time, Preston had already extended an offer to settle for $274,000. Tr. __. On April 10, Preston stated he could keep that offer open through the next day. Def. Ex. D. On April 11, 2014, Preston and Tiffey had a telephone conversation where they agreed to a settlement amount of $274,000, and agreed that Tiffey would send a summary of some settlement terms via e-mail.

Later that day, Tiffey sent such an e-mail to Preston,

stating the following:

> This will confirm that Ms. Akers has settled her claims
> against Minnesota Life for the sum of $274,000 in exchange
> for a complete release and dismissal with prejudice.  This
> will also confirm your agreement with (1) the language
> below which will appear on the forthcoming Release and (2)
> maintaining confidentiality as to this settlement going
> forward.
>
> Please advise how the settlement check should be made
> payable . . . .

Pl. Ex. F.  The referred-to "language below," in relevant part,

stated that:

> ML [(Minnesota Life)] agrees to pay Ms. Akers $274,000.00
> in exchange for:
>
> • A general release of any and all claims . . . that
>   Akers now has, or may have, against ML . . . .  These
>   released claims . . . include, but are not limited to,
>   any and all those for, or relating to: the Basic Life,
>   AD&D Rider, and Supplemental Life coverages issued by
>   Minnesota Life under the Policy . . . .
> • A dismissal of her Third Amended Complaint against ML
>   with prejudice;
> • An agreement by Ms. Akers and her counsel to keep the
>   amount of the settlement confidential;
> • An acknowledgement that the settlement is not an
>   admission of liability by ML, but rather represents a
>   comprise [sic] and settlement of a dispute.

Id.  Ten minutes later, Preston responded with an e-mail stating

"I agree with your summary of the settlement.  Will be in touch

about check information as soon as I hear from my co-counsel."

Id.

As promised, Tiffey sent a proposed settlement and

10

release agreement ("First Proposed Agreement") to Preston on
April 22, 2014.  Pl. Ex. G.  The First Proposed Agreement was
already executed by Minnesota Life, and Tiffey also had the
settlement check available.  Id.  The First Proposed Agreement
added many terms beyond those stated in the April 11 e-mail,
and, in fact, altered the language of the general release
appearing in the April 11 e-mail.  In relevant part, the general
release language put forth by Tiffey reads as follows:

> Plaintiff, for herself and her respective legal
> representatives, attorneys, successors, assigns, family
> members and heirs, hereby fully and forever releases and
> discharges Minnesota Life and its officers, directors,
> agents, employees, legal representatives, attorneys,
> subsidiaries, affiliates, insurers, successors,
> predecessors and assigns (collectively referred to as the
> "Released Parties"), of and from any and all claims, causes
> of action and/or rights of action that she had or may have
> had as of the Effective Date [(April 11, 2014)], that she
> may now have, or that she may ever may [sic] have against
> the Released Parties, arising under or relating to any
> federal or state law . . . (the "Released Claims").  The
> Released Claims include, but are not limited to, any and
> all claims, causes of action and/or rights of action for,
> or relating to, the Plan, the SPD, the Life and AD&D Plan,
> the Group Policy, the Insurance Coverages, [and] the
> federal Employee Retirement Income Security Act . . . .

Pl. Ex. H (emphasis supplied).  Most notable among the additions
is language inserted regarding assignments:

> Plaintiff certifies and warrants that she is the sole and
> exclusive owner of the Released Claims, and she has not
> assigned, pledged, or in any other manner whatsoever sold
> or transferred any right, title, or interest in any
> released claim arising out of or in any way whatsoever
> relating to the SPD, Life and AD&D Plan, the Group Policy,
> the Insurance Coverages and/or the Action.

Pl. Ex. H, at 3.

Both of these provisions ran completely counter to
Akers' position from the beginning, stated repeatedly, that the
Basic Life and AD&D insurance claims had been assigned by her to
Alpha in exchange for $548,000, that Akers would do nothing to
compromise Alpha's right to recover that sum either through
Akers or Minnesota Life lest she be made responsible therefor,
and that, if necessary, she would remain in the litigation in
name only to effectuate Alpha's recovery.  Tr. __, __.  That was
a fundamental tenet of Akers throughout the negotiations, well
known to Minnesota Life; and though Preston had stated that he
agreed with the "summary of the settlement" by Tiffey, both knew
that safeguarding the perceived assignment was a matter
remaining to be addressed in their formal written agreement.
Tiffey nevertheless expected the agreement proposed by him would
be signed by Akers.  Tr. __.

Upon review of the First Proposed Agreement, Preston
and his co-counsel objected to the above-quoted provisions, and
expressed these concerns to Tiffey.  Pl. Ex. K.  On April 24,
2014, following a phone call between them, Preston requested via
e-mail that Tiffey include a term specifically stating that
Alpha's rights would not be affected by the settlement, and
relayed his impression that the settlement was solely for claims

under the Supplemental Life coverages instead of all three.  Pl. Ex. L.

That evening, Tiffey attempted to modify the First Proposed Agreement to Preston's liking, by reducing the language regarding assignment to the provision that "Plaintiff certifies and warrants that she is the sole and exclusive owner of the Released Claims."  Tiffey also added the following: "[I]n executing this Agreement, the parties concur that (a) Alpha Natural Resources, LLC ("Alpha") has an Amended Cross-Claim against Minnesota Life in the Action, (b) Minnesota Life has denied the same in the Action, and (c) this settlement is not intended to affect Alpha's Amended Cross-claim."  Pl. Ex. I. The language regarding a general release of all three claims remained the same, except that, with respect to the provisions quoted above from Plaintiff's Exhibit H, Tiffey changed "The Released Claims include . . ." to "The Released Claims of the Plaintiff include . . . ."  Id.

The next day, April 25, Preston remained unsatisfied with this Second Proposed Agreement.  Through another e-mail, he suggested disclosing the settlement agreement to Alpha -- albeit omitting the settlement amount -- to see if Alpha approved.  Pl. Ex. N.  However, Tiffey declined that offer.  Later that day, Preston proposed another agreement, entitled "Partial Settlement

13

and Release Agreement". The Partial Settlement and Release agreement, among other things, changed the "General Release" in the prior suggested agreements to a "Partial Release", specifying that only the Supplemental Life claim was released. Pl. Ex. Q.

Also on April 25, counsel for Akers, Alpha, and Minnesota Life had a joint telephone call to prepare the joint status report due to the court that day. Tiffey was on the call for Minnesota Life. Preston, Rhonda Blackburn, and Dan Snuffer, all counsel for Akers, were on the call. Arie Spitz was on the call as counsel for Alpha. At first during the call, Tiffey informed Spitz that a settlement had been reached. This was the first time Alpha had learned that a settlement existed, and Spitz inquired as to whether the settlement would have any effect on Alpha's claims. Tr. __. To this, Preston responded that the settlement was only for the Supplemental Life claim and that it was not intended to affect Alpha's rights to recover on the other two claims. Tr. __, __. Tiffey testified that when Preston spoke, Preston said "in so many words, 'I don't speak for Ed [Tiffey], but that's the case'", and that he, Tiffey, remained silent following Preston's statement because he and Preston were still working out the details of the release. Tr. __, __. However, Preston, Blackburn, and Snuffer all testified

14

that Tiffey verbally agreed with Preston's statement. Tr. __,
__, __.

Of course, if the court accepts the plaintiff's
attorneys' recollection of the call, Tiffey assented to a
representation that the settlement was for the Supplemental Life
claim only and that Alpha's rights were not affectd. But even
if the court adopts Tiffey's view -- that he remained silent --
the court nevertheless finds that his silence was an expression
of assent to Preston's representation that the settlement was
for the Supplemental Life claims only and it was not to affect
Alpha. Preston's statement that he did not speak for Tiffey was
an invitation for Tiffey to speak and disagree if he took
exception to Preston's characterization. Tiffey's reason for
not speaking up -- that negotiations were ongoing on the details
of the agreement -- is not a compelling one, particularly
inasmuch as the inquiry was directed to a major issue affecting
all parties in the case, all of whom were represented on the
call.

After the call, Tiffey indicated to Preston that the
Partial Settlement and Release Agreement proposed by Preston was
not agreeable to him. In response, Tiffey sent a final proposed
agreement on April 28, 2014, that, in relevant part, added one
portion to the General Release section of Tiffey's April 24th

15

Second Proposed Agreement:

> The Parties agree that Plaintiff is releasing only the claims that she had as of Effective Date [(April 11, 2014)] and at any time after that date, and that this settlement is not intended to affect Alpha's Amended Cross-Claim.

Pl. Ex. J.  The rest of the General Release section remained the same, as did the language stating that Akers was the "sole and exclusive owner of the Released Claims".

This offered agreement was also not satisfactory to Preston.  Soon after, Minnesota Life's motion to enforce settlement was filed, and Akers' motion followed.  Minnesota Life's motion to enforce settlement requested that the court enforce "the settlement reached . . . on April 11, 2014," attaching its final proposed agreement of April 28, 2014.

Through the entire pendency of this case, Akers never told Preston that he was permitted to settle any claim other than the Supplemental Life claim.  Tr. __, __, __, __.


### III. Conclusions of Law

"A settlement agreement is considered to be a contract." Sadighi v. Daghighfekr, 66 F. Supp. 2d 752, 759 (D.S.C. 1999) (citing United States v. ITT Continental Baking Co., 420 U.S. 223, 238 (1975)).  "[R]esolution of a motion to enforce a settlement agreement draws on standard contract

16

principles, [although] it may be accomplished within the context
of the underlying litigation without the need for a new
complaint.  To this extent, district courts have inherent
authority, deriving from their equity power, to enforce
settlement agreements." Hensley, 277 F.3d at 540.  As noted,
the court must find whether a settlement occurred and if so, the
terms of that settlement.  Id. at 540-41.

        In their briefing, the parties cite both West Virginia
case law and federal case law as applicable to the purported
settlement agreement.  The Fourth Circuit has stated that:

> Settlements and releases assertedly entered into in respect
> of federal litigation already in progress implicate federal
> procedural interests distinct from the underlying
> substantive interests of the parties.  Once a claim --
> whatever its jurisdictional basis -- is initiated in the
> federal courts, we believe that the standards by which that
> litigation may be settled, and hence resolved short of
> adjudication on the merits, are preeminently a matter for
> resolution by federal common law principles, independently
> derived.

Gamewell Mfg., Inc. v. HVAC Supply, Inc., 715 F.2d 112, 115 (4th
Cir. 1983).

        The Gamewell decision is cast into some doubt by a
line of Supreme Court cases ending with Atherton v. FDIC, 519
U.S. 213, 218 (1997).  In Atherton, the Court noted that "cases
in which judicial creation of a special federal rule would be
justified are few and restricted."  Id. (quoting O'Melveny &

17

<u>Myers v. FDIC</u>, 512 U.S. 79, 87 (1994) (internal quotation marks and ellipses omitted)).  The Court also indicated that federal common law rules should apply only when there is "a significant conflict between some federal policy or interest and the use of state law."  <u>Id.</u> (quoting <u>Wallis v. Pan Am. Petroleum Corp.</u>, 384 U.S. 63, 68 (1966)).

Since these cases have been decided, the Fourth Circuit does not appear to have further elaborated on whether federal common law or state law applies in the context of settlement negotiations.  There are Fourth Circuit cases where state law has been applied, and also those where the Fourth Circuit has applied an apparent federal common law.  <u>Compare, e.g.,</u> <u>Topiwala v. Wessell</u>, 509 Fed. App'x 184, 186 (4th Cir. 2013) (assuming Maryland law applies to a particular settlement), <u>with</u> <u>Auvil v. Grafton Homes, Inc.</u>, 92 F.3d 226, 229-32 (4th Cir. 1996) (relying on various federal court cases and the Restatement to describe the doctrine of apparent authority).  A commentator has also suggested it is appropriate to borrow the forum state's law as a matter of federal common law:

> In many cases, relevant factors may indicate that the federal courts should follow or "adopt" the law of the forum state as the governing rule of decision, although it will be doing so as a matter of federal law. In other words, the federal courts may apply state law -- not because of any compulsion to do so ... but because federal

interests would not be impaired by doing so, state law is "already there," people are familiar with it, and the state rule is not inimical to federal interests.

Wright et al., Federal Practice & Procedure § 4514 (2014). This approach has been endorsed by at least one district court in this circuit in the context of enforcement of settlement agreements. See Sadighi, 66 F. Supp. at 759 n.2 (D.S.C. 1999). Ultimately in this case, resolution of the question of whether to apply federal precedent or state law is not necessary, because the court finds that under both the guiding federal and state precedents, there was no settlement.


A. Authority to Settle

Minnesota Life argues that whether or not Preston had actual authority to settle all three coverages under the Policy, it was apparent to Tiffey when the settlement was allegedly reached on April 11 that Preston had that authority, and that the settlement agreement is enforceable because Minnesota Life is entitled to rely on Preston's apparent authority. Akers argues that Preston only had actual authority to settle the Supplemental Life claims and that Tiffey was aware of that.[5]

As a preliminary note, the court finds that Preston

---

[5] While this did not constitute an argument by Akers in the briefing that preceded the evidentiary hearing, it was presented at the hearing. Tr. __, __.

did not have actual authority to settle the Basic Life and Basic AD&D claims.  Minnesota Life has produced no evidence suggesting that Preston had actual authority from Akers to settle claims beyond the Supplemental Life claims.  Akers, on the other hand, has produced testimony from multiple sources, including Preston, Akers, and Rhonda Blackburn (whom Akers had initially engaged as her attorney).  All stated that Preston never had authority to settle anything beyond the Supplemental Life claims.  Tr. __, __, __, __.

In support of Minnesota Life's argument that Preston had "apparent authority," Minnesota Life cites West Virginia case law stating that "[w]hen an attorney appears in court representing clients there is a strong presumption of his authority to represent such clients, and the burden is upon the party denying the authority to clearly show the want of authority."  Syl. Pt. 1, Miranosky v. Parson, 161 S.E.2d 665, 665, 152 W. Va. 241, 241 (1968).  See also Messer v. Huntington Anesthesia Group, Inc., 664 S.E.2d 751, 761, 222 W. Va. 410, 420 (2008) ("[A] clear showing [is] necessary to overcome the presumption of [an attorney's] apparent authority to bind his clients to [a] settlement agreement.").

Minnesota Life argues that Akers has not made the necessary showing to overcome the state law presumption that

20

Preston was vested with the authority to settle all three insurance claims rather than only the Supplemental Life claim. But the court finds that Akers has put forth enough evidence to overcome the presumption.  Tiffey himself testified that he knew, well before April 11, 2014, that Akers "did not want to hurt Alpha" by settling, and knew of Akers belief that she had assigned those two claims to Alpha.  Preston expressed these sentiments to Tiffey repeatedly.  Even in prior negotiations in 2012, Preston made it known to Tiffey that he wanted to settle without affecting any claims that Preston believed had been assigned to Alpha.  Though this representation was made before the Third Amended Complaint was filed, it still shows that Tiffey was aware that Preston had sought settlement from the beginning that would not affect Alpha.  Also, before the April 11 e-mails, Tiffey and Preston negotiated over the settlement amount, raising it from $255,000 to $274,000, the exact amount claimed under the Supplemental Life policy.  All of these facts, taken together, should have alerted Tiffey, and in turn, Minnesota Life, that Akers had not authorized the settlement of all three insurance claims, two of which she believed she no longer owned.  Accordingly, any presumption that Preston had the authority to settle all three claims is rebutted.

The Fourth Circuit has described an attorney's

21

authority on behalf of his client with respect to settlement in

a somewhat different manner:

> It is generally accepted that when a client retains an
> attorney to represent him in litigation, absent an express
> agreement to the contrary, the attorney has <u>implied</u>
> authority to conduct the litigation and to negotiate its
> resolution.  But the "[s]ubstantive decisions of whether to
> bring suit, to dismiss suit, or to settle are not by
> implication ones that the attorney is authorized to make."
> <u>Schafer v. Barrier Island Station, Inc.</u>, 946 F.2d 1075,
> 1079 (4th Cir.1991).  The law of West Virginia -- the state
> in which this alleged settlement agreement was made -- is
> not to the contrary.  <u>See</u> <u>Humphreys v. Chrysler Motors
> Corp.</u>, 184 W.Va. 30, 32 (1990) (per curiam); <u>Dwight v.
> Hazlett</u>, 107 W.Va. 192 (1929).

<u>Auvil v. Grafton Homes, Inc.</u>, 92 F.3d 226, 229-30 (4th Cir.

1996)(emphasis in original).  As for apparent authority to

settle, the court continued:

> Apparent authority results from a principal's manifestation
> of an agent's authority to a third party, regardless of the
> actual understanding between the principal and agent.  <u>See
> Crothers v. Commodity Futures Trading Comm'n</u>, 33 F.3d 405,
> 410 (4th Cir. 1994); Restatement (Second) of Agency § 8
> (1957); <u>see also</u> <u>General Elec. Credit Corp. v. Fields</u>, 148
> W.Va. 176 (1963).  Indeed, apparent authority is "entirely
> distinct" from -- and sometimes conflicts with -- both
> express and implied authority.  Restatement (Second) of
> Agency § 8 cmt. a.  When a principal, through his acts or
> omissions, causes a third party, in good faith and in the
> exercise of reasonable prudence, to rely on the agent's
> authority to act on the principal's behalf, the agent can
> bind the principal.  <u>See Crothers</u>, 33 F.3d at 410; <u>General
> Elec. Credit Corp.</u>, 133 S.E.2d at 783-84.

> From the well-established tenet that an agent cannot create
> his own authority to represent a principal, <u>see</u> <u>NLRB v.
> Local Union 1058, UMW</u>, 957 F.2d 149, 153 (4th Cir. 1992),
> it follows that an agent's statements that he has such
> authority cannot, without more, entitle a third party to
> rely on his agency, <u>see</u> <u>Fennell v. TLB Kent Co.</u>, 865 F.2d
> 498, 502 (2d Cir. 1989); <u>D & G Equip. Co. v. First Nat'l</u>

> Bank of Greencastle, 764 F.2d 950, 954 (3d Cir. 1985); see
> also Restatement (Second) of Agency §§ 7, 285 (1957).  An
> agent's authority must be conferred by some manifestation
> by the principal that the agent is authorized to act on the
> principal's behalf. Id. §§ 7-8.
>
> . . .
>
> The authority to negotiate . . .  is far different from the
> authority to agree to a specific settlement.  Our review of
> the record uncovered no manifestation by [the plaintiff] to
> [the defendant] or its attorneys from which [the defendant]
> could reasonably conclude that [the plaintiff] had
> authorized [his attorney] to consummate a settlement.

Id. at 230 (emphasis in original).

In this case, Minnesota Life has put forth no evidence
that Akers herself -- the principal -- ever indicated to Tiffey
-- the third party -- that Preston had the authority to settle
the Basic Life and AD&D claims, nor does Tiffey identify any
representation (or lack thereof) that he relied upon to form a
belief that Preston had the authority to settle either of those
claims.  Indeed, Tiffey never indicated that he received any
communication from Akers at all.  In keeping with Auvil, the
court finds a lack of authority, real or apparent, to settle the
Basic Life and AD&D claims.  Id.


B. Mutual Assent

Minnesota Life argues that a meeting of the minds
occurred on April 11, 2014, when Preston replied to Tiffey's e-
mail containing some terms with the statement "I agree with your

23

summary of the settlement."  Akers argues that Tiffey had a

"secret intention" of obtaining dismissal of all three claims,

and that contract law requires the court to disregard this

secret intention.

Under federal precedent, even assuming that the April

11, 2014 phone call or e-mail exchange was a meeting of the

minds as to certain terms of the settlement, the question still

arises as to whether that agreement forms a binding contract.

Indeed, neither party disputes that the terms disclosed in the

April 11 e-mail exchange were not a final agreement, as both

have proposed added terms and differing forms of a final

settlement and release agreement.

In determining whether a preliminary agreement, such

as the phone call and the e-mails on April 11, 2014, constitutes

a binding, enforceable agreement, the Fourth Circuit has adopted

the view that these sorts of agreements are divided into two

types: Type I and Type II.  Burbach Broadcasting Co. of Delaware

v. Elkins Radio Corp., 278 F.3d 401, 407 (4th Cir. 2002).  There

the court stated:

> A Type I agreement, the "fully binding preliminary
> agreement," occurs when parties have reached a complete
> agreement (including the agreement to be bound) on all
> issues perceived to require negotiation.  Such an agreement
> is preliminary only in form -- only in the sense that the
> parties desire a more elaborate formalization of the
> agreement. "The second stage is not necessary; it is merely

considered desirable." [Teachers Insurance and Annuity
Assoc. of America v. Tribune Co., 670 F. Supp. 491, 498
(S.D.N.Y. 1987)].

. . .

Among the circumstances which may be helpful in determining
whether [a] [T]ype [I] agreement has been made are 1)
whether there has been an express reservation of the right
not to be bound in the absence of a writing, 2) whether
there has been partial performance of the contract, 3)
whether all of the terms of the alleged contract have been
agreed upon, and 4) whether the agreement at issue is the
type of contract that is usually committed to writing.

Id. at 407-08 (internal citations omitted).

Here, the third and fourth factors indicate that Akers

and Minnesota Life did not form a Type I agreement.  All of the

terms of the agreement were plainly not agreed upon, as is

evidenced by the parties' near-constant negotiations over the

wording of the release and their addition of extra terms after

April 11.  In particular, Tiffey's proposed term regarding

whether Akers assigned her claims was a substantially material

one over which the parties could not agree, and was nowhere to

be seen in the April 11 e-mail.  Similarly, Preston pushed for

language in the contract reflecting that Alpha would remain

unaffected by any settlement, and Tiffey altered somewhat the

language of the proposed agreement in a vain attempt to meet

those concerns.  Even the terms of the General Release were not

agreed upon, as Tiffey changed the language of it from the April

11 e-mail to the First Proposed Agreement.  As for the fourth

factor, a settlement agreement such as this is typically committed to writing.  Indeed, Tiffey indicated on April 11 that he would later forward a written agreement to Preston, and when he did, he expected Akers to sign it if she approved. Accordingly, the parties did not come to a Type I preliminary agreement.

A Type II agreement is described as follows:

The binding obligations attached to a Type II preliminary agreement are different from those that arise out of the first type of agreement.  Type I agreements bind parties to their ultimate contractual objective in recognition that a contract was reached, despite the anticipation of further formalities.  Type II agreements do not commit the parties to their ultimate contractual objective. Rather, they commit the parties to negotiate the open issues in good faith in an attempt to reach the contractual objective within the agreed framework.  Under this duty to negotiate in good faith, a party is barred from renouncing the deal, abandoning the negotiations, or insisting on conditions that do not conform to the preliminary agreement.

. . .

The five factors [to be considered in whether a Type II agreement was formed] are 1) the language of the agreement, 2) the existence of open terms, 3) whether there has been partial performance, 4) the context of negotiations, and 5) the custom of such transactions. Teachers, 670 F.Supp. at 499-503. The first factor, the language of the agreement, is arguably the most important factor in a court's analysis. However, when the language of an alleged agreement is susceptible to more than one interpretation, as here, a court should focus on the other four factors, which necessarily involves a review of the facts and circumstances surrounding the agreement.

Id. at 407-08.  For Type II agreements, it is possible that the parties will not eventually come to agreement after negotiating in good faith on other terms, or that circumstances may change, and the parties may abandon the agreement.  Id. at 407 n.2.  In fact, the parties did abandon negotiations when each could not agree about the term regarding a warranty that Akers did not assign her claims and when they could not agree about a term stating that Alpha's rights are not affected.  The parties were simply unable to agree to a final settlement.

The court concludes that a Type II agreement was not formed.  Although Preston responded to Tiffey's April 11 e-mail by stating that he agreed with Tiffey's "summary of the settlement," both knew that still other terms were meant to be included in a final writing and that Preston did not intend to be bound by the "summary" alone.  For that matter, Tiffey did not intend to be bound by the April 11 terms either, because he changed the language of the general release from the April 11 e-mail to that contained in his First Proposed Agreement.  As the court has already noted, there were open terms -- such as the warranty regarding assignment of all three claims and the elimination of any potential adverse impact on Alpha's rights -- that were not in the April 11 e-mail but important to the settlement.  Given that Preston had repeatedly represented that

he would not settle in any way that adversely affected Alpha,
the context of the negotiations suggested that Preston did not
intend to be bound solely by the April 11 e-mail, inasmuch as
Preston would have expected (and indeed did expect) a term in
the agreement regarding Alpha's rights.  Moreover, there was no
partial performance.  And, the custom of such transactions --
and what was expected in this transaction -- was that the
settlement would be reduced to a final writing and agreed and
signed by the parties.

Accordingly, the preliminary agreement of April 11 is
not binding as a matter of federal law.

West Virginia law also dictates that the agreement is
unenforceable in this instance.  In Blair v. Dickinson, the West
Virginia Supreme Court of Appeals stated:

> While a valid contract may be made between parties by
> memorandum, telegrams, and correspondence, care should be
> taken not to construe as an agreement that which the
> parties only intended to be a preliminary negotiation. The
> question in such cases is, Did the parties mean to contract
> by the memorandum of agreement, or were they only settling
> the terms of an agreement into which they proposed to enter
> after all its particulars were adjusted, which was then to
> be formally drawn up, and by which alone they designed to
> be bound? Such intention must necessarily be determined
> from the circumstances and surroundings appearing in each
> particular case.

54 S.E. 2d 828, 844, 133 W. Va. 38, 68-69, (1949) (quoting

Virginian Export Coal Co. v. Rowland Land Co., 131 S.E. 253,

28

253, 100 W. Va. 559, 559 (1926).)  The addition of terms

regarding assignment to a settlement agreement, as occurred

here, constitutes the addition of material terms to an

agreement.  Triad Energy Corp. of W. Va., Inc. v. Renner, 600

S.E.2d 285, 289, 215 W. Va. 573, 577 (2004).  The state supreme

court has also indicated that "when it is shown that the parties

intend to reduce a contract to writing this circumstance creates

a presumption that no final contract has been entered into,

which requires strong evidence to overcome."  Sprout v. Board of

Educ. of County of Harrison, 599 S.E.2d. 764, 768, 215 W. Va.

341, 345 (2004) (quoting Blair, 54 S.E.2d at 844, 133 W. Va. at

70).  Factors to be considered in determining whether the

parties intended to reduce a contract to final writing are:

> whether the contract is of that class which are usually
> found to be in writing; whether it is of such nature as to
> need a formal writing for its full expression; whether it
> has few or many details; whether the amount involved is
> large or small; whether it is a common or unusual contract;
> whether the negotiations themselves indicate that a written
> draft is contemplated as a final conclusion of the
> negotiations. If a written draft is proposed, suggested or
> referred to, during the negotiations, it is some evidence
> that the parties intended it to be the final closing of the
> contract.

Blair, 54 S.E.2d at 844, 133 W. Va. at 68.  As with the similar

factors enumerated in the federal cases, these factors support a

conclusion that the April 11, 2014 e-mail is not enforceable.

The settlement needed a formal writing for complete expression.

Tiffey indicated as much in the e-mail when he stated that a

release would be forthcoming.  The amount involved is large, at $274,000.  The contract is unusual, inasmuch as Akers, as well as Alpha, believed that a writing that purported to settle claims that Akers did not own may adversely affect Alpha, the requirements of which may adversely affect Akers as well.  The proposed settlements were very detailed.  Numerous written drafts were proposed after the April 11, 2014 e-mail exchange. The court concludes that the parties intended to be bound by a final written agreement, one which they could eventually not agree upon.  Thus, there is no enforceable settlement under West Virginia law.  <u>See, e.g.</u>, <u>Sprout</u>, 215 W. Va. at 345-46 ("although an agreement may have been tentatively reached . . . the letters and proposed written settlement agreements . . . showed that there was no true meeting of the minds).

IV.

The court, having concluded that Akers and Minnesota Life have not formed an enforceable settlement agreement, ORDERS that Minnesota Life's motion to enforce settlement, filed May 5, 2014, be, and it hereby is, denied.  The court further ORDERS that Akers' motion to enforce settlement or in the alternative determine no meeting of the minds existed, filed May 13, 2014, be, and it hereby is, denied insofar as it seeks to enforce a settlement, and granted insofar as it seeks a determination that there was no meeting of the minds.

The Clerk is directed to transmit copies of this order to counsel of record and any unrepresented parties.

ENTER: August 4, 2014

John T. Copenhaver, Jr.
United States District Judge